1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

11

**DAVID GABINO CHAVARRIA,**

12

Petitioner,

**No. CV 07-5857-DOC (RCF)**

13

v.

14

**TIMOTHY E. BUSBY, Warden,[1]**

15

Respondent.

**AMENDED**
**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

16

17      This Amended Report and Recommendation is submitted to the Honorable David O.

18  Carter, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General

19  Order 05-07 of the United States District Court for the Central District of California.

20      Petitioner, a state prisoner proceeding pro se, filed a Petition For Writ Of Habeas

21  Corpus on September 10, 2007, followed by a First Amended Petition on July 14, 2008.

22  Respondent filed an Answer on December 18, 2008.  Petitioner filed a Traverse on January

23  18, 2009.

24      On September 2, 2010, the Court issued an initial Report and Recommendation,

25  recommending that the First Amended Petition be granted as to Petitioner's claim that the

26  evidence was insufficient to support his conviction.  Respondent filed objections on September

27

28      [1]  The Court substitutes Timothy E. Busby, Warden of Ironwood State Prison and Petitioner's current custodian, as Respondent in place of Jeanne S. Woodford, the former Director of the California Department of Corrections and Rehabilitation.  See Rule 2(a), Rules Governing Section 2254 Cases in the United States District Courts; Fed. R. Civ. P. 25(d).

17, 2010.  For the reasons that follow, the Court now recommends that the First Amended Petition be denied in its entirety.

## Background

This case centers on a shooting among rival gang members.  Petitioner and Damon Flores, members of the Dog Patch gang, drove into territory controlled by the East Side Paramount gang in Bellflower, California.  An East Side Paramount member, David Cabrera, Jr., confronted them at gunpoint.  Shots were fired and a gun battle broke.  When the smoke settled, David Cabrera was dead.

Petitioner and Flores were charged with first degree murder, conspiracy to commit murder, and shooting at an inhabited dwelling.  The joint trial that ensued was a lengthy and complex proceeding, with hard fought battles over discovery and the admissibility of evidence. At the close of the prosecution's case-in-chief, the trial court granted a defense motion for judgment of acquittal on the first degree murder charge.

The jury found Petitioner and Flores guilty of conspiracy to commit murder and shooting at an inhabited dwelling.  The jury found true allegations that the crimes were committed for the benefit of a criminal street gang and that Petitioner personally used a firearm during the commission of the crimes.  [2 Clerk's Transcript ("CT") 408-11, 507-09; 23 Reporter's Transcript ("RT") 7806-08.]  Petitioner admitted a prior serious and violent felony, and pleaded no contest to one count of being a felon in possession of a firearm.  [23 RT 7815-24.]

The California Court of Appeal affirmed the conspiracy conviction on February 23, 2006, but reversed the conviction for shooting at an inhabited dwelling on the basis of instructional error.  The appellate court also found multiple sentencing errors and remanded for resentencing.  [Lodged Doc. 8.]  Petitioner was sentenced to fifty-four years to life in state prison.  [First Am. Petition at 2.]  The California Supreme Court denied review on June 14, 2006.  [Lodged Doc. 13.]  Petitioner did not seek state habeas corpus relief.

Due to the trial court's acquittal on the murder charge, and the appellate court's reversal of the conviction for shooting at an inhabited dwelling, the only conviction remaining for this Court's consideration is Petitioner's conviction for conspiracy to commit murder.  As explained

below, to obtain a conviction on this charge the prosecution was required to prove that Petitioner and Flores formulated an agreement to commit murder and did so with the specific intent to kill.

The Court is now persuaded that in preparing its initial Report and Recommendation, it placed undue emphasis on the trial court's judgment of acquittal on the first degree murder charge. Because the trial court did not explain the basis for its ruling, it is not possible to draw any conclusions about the state of the evidence presented in connection with the murder charge. Upon closer inspection of the evidence surrounding the shooting, and viewing the totality of the evidence in the light most favorable to the prosecution, the Court now concludes that the California Court of Appeal reasonably determined that a rational trier of fact could have found the material elements of conspiracy to commit murder beyond a reasonable doubt. Accordingly, Petitioner is not entitled to federal habeas corpus relief.

<u>**Facts**</u>

**A. The Birthday Party**

On September 29, 2001, Misty Luna drove her white 1987 Cadillac to a birthday party in Paramount. [7 RT 1829-30.] Her cousin Sylvia Moran also attended the party, as did Moran's friend Marisela Ballesteros. [7 RT 1830, 1838; 10 RT 2847-48, 2861.] The party was hosted by a member of the Dog Patch gang. Several Dog Patch members were in attendance, including Sylvia Moran and Damon Flores. [7 RT 1839, 1843; 10 RT 2852-53, 2862; 11 RT 3044; 12 RT 3381-83; 17 RT 4851.] The host's cousin, David Cabrera, Jr., also attended the party. Cabrera was a member of the East Side Paramount gang, a rival of Dog Patch. [12 RT 3379-81; 17 RT 4844, 4867-68.]

About ten minutes after arriving at the party, Luna left in her Cadillac, accompanied by Sylvia Moran and Marisela Ballesteros. Moran sat in the front passenger seat and Ballesteros sat in the back. [7 RT 1837-38, 1847; 10 RT 2863.] They drove around the block and stopped, at which point Moran got out to talk to Damon Flores. Moran got back into the car with Flores. [7 RT 1847-52, 1871-72; 10 RT 2864.] The group stopped at another house about a block away where Flores got out. The others waited for Flores for about five or ten

1    minutes.  When he returned to the car he was carrying something about twenty-four to thirty

2    inches long and wrapped in a green sweatshirt.  [7 RT 1875-78, 1883-85.]

3         While in the car, Flores stated that he wanted to drive by the house of an East Side

4    Paramount member to see if he was home.  Flores directed Luna where to drive.  [1 CT 228-

5    33].[2]  Flores told the others, "That fool's driving around in my neighborhood, whatever....  Fuck

6    him."  [1 CT 233.]  Flores also said he wanted to find the rival "because he was passing by

7    earlier."  [1 CT 242.]  While in the car, Flores held a gun, which Ballesteros described as a

8    "long gun," with a charcoal grey barrel.  [1 CT 238-40, 242.]

9         As the group drove, Petitioner approached from behind in a gold Intrepid and flashed

10   his headlights at the Cadillac.  [7 RT 1879-80.]  Petitioner pulled abreast of the Cadillac.  As

11   the two vehicles continued driving, Luna heard Flores tell Petitioner, "I know where that

12   cheese-sider lives," indicating he knew where to locate a rival gang member.[3]  [9 RT 2474.]

13   Luna then heard Flores say to Petitioner, "Follow me, Dog."  [7 RT 1898.]

14        Although there was additional conversation between Petitioner and Flores, Luna was

15   not able to hear anything more because the car radio was up too loud.  [7 RT 1892, 1894,

16   1898; 8 RT 2241-42; 10 RT 2742.]  When pressed for more specifics, Luna explained that she

17   "didn't hear the conversation in detail," [7 RT 1898], and she "just heard pieces of it."  [8 RT

18   2241.]

19        Flores instructed Luna to drive to Los Angeles Street in Bellflower.  Petitioner followed

20

21        [2] Ballesteros had difficulty remembering what took place.  She claimed she had been drinking
     and was asleep in the back of Luna's car.  [10 RT 2869; 11 RT 3077, 3095.]  However, the deputy
22   who interviewed her shortly after the shooting testified that she was sober.  [17 RT 4952.]  Due
     to numerous inconsistencies in her testimony, the trial court authorized the prosecution to play a
23   tape recording of her police interview for the jury.  [16 RT 4603-04; 18 RT 5165.]  References to
     the Clerk's Transcript are to the transcription of the interview, which was provided at trial to assist
24   the jury.

25
          [3] On direct examination, Luna testified that Flores said "[h]e knew where there was a cheese-
26   sider at," [7 RT 1889-91], and later restated the phrase as, "he knew where this cheese-sider
     was."  [7 RT 1892, 1894.]  She later confirmed that during an interview immediately after the
27   murder, she told a detective that Flores said, "I know where that cheese-sider lives."  [9 RT 2474.]
     For purposes of federal habeas review, the Court construes the evidence in the light most
28   favorable to the prosecution, and relies on the statement as relayed to the detective.

in his own vehicle.  [7 RT 1899-1900, 1911-12.]

**B. The Shoot Out**

The group drove to David Cabrera's house and passed by the house once.  Flores instructed Luna to drive by the house again but to drive slower.  [7 RT 1900-01.]  When they turned the corner, Flores recognized a car he had seen earlier at the party.  [1 CT 234.]  When they passed the house again, Flores confirmed, "There's his house."  [1 CT 235-37.]

Andres Moreno, a Cabrera family member who had attended the birthday party, was the first to return to the Cabrera residence.  He noticed the Cadillac and Intrepid passing by the house and recognized the Cadillac from the party.  [12 RT 3385-89.]  The vehicles traveled at about five miles per hour, with the Intrepid approximately one car length behind the Cadillac.  [12 RT 3389-90.]  The vehicles drove around the block and passed by a second time, stopping in front of the Cabrera residence before continuing down Los Angeles Street.  [12 RT 3391-94.]  At the next intersection, the vehicles made a u-turn and drove past the house a third time.  [12 RT 3401-02.]  Moreno called his uncle, Ricardo Cabrera, to alert him to the suspicious cars.  As the family members returned to the house, they went inside.  [12 RT 3403, 3407, 3409.]  David Cabrera went inside the house and exited again.  Moreno followed him outside and watched as Cabrera walked across the street.  [12 RT 3409-10.]

The Cadillac and the Intrepid appeared again, driving west on Los Angeles Street toward Virginia Avenue, passing the Cabrera residence on the left, or driver's side.  [10 RT 2786-87; 11 RT 3159; 12 RT 3413-14, 3422; 13 RT 3668.]  The vehicles were traveling at approximately ten to fifteen miles per hour, with the Intrepid a car length behind the Cadillac.  [12 RT 3415, 3424.]  As the Cadillac approached the house opposite the Cabrera residence, David Cabrera stepped out from under a tree on the passenger's side, pointed a handgun at the Cadillac, and said, "What now?"  [7 RT 1903-04, 1908; 12 RT 3413-14, 3417, 3421.]

Cabrera took several steps toward the Cadillac as Luna continued west in the direction of Virginia Avenue.  [7 RT 1903, 1907, 1912; 12 RT 3422-23.]  Cabrera then turned and pointed his gun at Petitioner's vehicle.  As Petitioner's car passed Cabrera, Moreno heard three shots fired in quick succession across the street from the Cabrera residence, but did not

1   see what happened.  [12 RT 3424-26.]  Luna described the shots as coming from behind her
2   and originating from the area under the tree where Cabrera had been standing.  [7 RT 1914,
3   1934-35; 8 RT 2256-57; 10 RT 2749-50.]

4       Scott Wolf, an off-duty Sheriff's deputy, lived next door to the Cabrera residence.  [11
5   RT 3155-59.]  After hearing a single gunshot and a car accelerating, he opened his front door
6   and looked out.  [11 RT 3158-59, 3173.]  Wolf testified that it did not sound like the first shot
7   had come from the Cabrera residence.  [12 RT 3347.]  Rather, the shot was more distant or
8   muffled, and appeared to come from the area in front of the Wolf and Cabrera residences.  [12
9   RT 3347-48.]

10      After the initial shots, Scott Wolf saw multiple people exiting the Cabrera house and
11  watched as Ricardo Cabrera extended a gun in a westward direction toward Virginia Avenue
12  and fired five shots.  [11 RT 3159-63.]  Moreno testified that Ricardo exited the house after the
13  initial gunfire and fired two to three shots from a chrome or silver revolver in the direction of
14  Virginia Avenue.  [12 RT 3428-30, 3438-39.]  Wolf saw a single muzzle flash from a second
15  weapon being fired from the Cabrera residence but could not identify the second shooter.  [11
16  RT 3162-65.]  The second gunman also fired to the west in the direction of Virginia Avenue.
17  [11 RT 3165.]   Gunfire was returned from the opposite direction near Virginia Avenue and
18  Wolf took cover in the doorway of his house.  [11 RT 3162, 3165-67, 3171.]

19      In total, Wolf estimated that he heard ten or more shots fired from four different guns,
20  with two weapons being fired from each side.  [11 RT 3171.]  He did not notice any gunfire
21  originating from, or anyone standing on, the other side of the street where Cabrera had been
22  standing.  [11 RT 3167-68.]  Neither Wolf nor Moreno could account for David Cabrera's
23  whereabouts during the gun battle.  [12 RT 3348, 3427-28.]

24      Luna testified that when she reached the intersection of Los Angeles and Virginia,
25  Flores told her to stop and he got out of the car.  [7 RT 1915, 1919, 1924-25; 11 RT 3060.]
26  Petitioner also stopped at the intersection, but Luna did not notice if Petitioner got out of his
27  vehicle.  [7 RT 1937-38; 8 RT 2124-25.]  Luna heard additional gunshots after Flores exited
28  the car, but did not see who fired.  [7 RT 1934-37; 8 RT 2125, 2217.]  Ballesteros saw Flores

1   shoot five to six rounds with a rifle after he exited the car.  [1 CT 238-40.]  She also saw two to

2   three men standing in the yard of the Cabrera home firing weapons.  [11 RT 3058-59, 3094,

3   3108; 1 CT 237.]

4       Following the shootout, Flores returned to the Cadillac.  Luna fled the scene, leading

5   police on a high speed chase.  [5 RT 1315-23; 7 RT 1939; 11 RT 3067; 14 RT 3934, 3936.]

6   During the police pursuit, Luna heard Flores state that he had fired a shotgun and he later

7   threw a gun out the window of the vehicle as they traveled on the 405 freeway.  [7 RT 1949-50;

8   11 RT 3074.]

9       Meanwhile, Wolf saw David Cabrera's body lying under a tree across the street.  [11 RT

10  3168, 3174.]  He saw Ricardo Cabrera and another man walk into the street holding guns.  [11

11  RT 3171, 3175.]  Someone said "get rid of the guns."  [11 RT 3176.]  Wolf saw someone take

12  two to three guns and run into the house.  [11 RT 3176.]  Moreno testified that he picked up

13  two guns from the ground next to Cabrera and hid them in a doghouse in the Cabreras'

14  backyard.  [12 RT 3442-45.]

15      A medical examiner testified that Cabrera died from a single gunshot wound to the

16  head.  [11 RT 3012.]  The fatal bullet entered the front of the face and exited through the back

17  of the head, and was not recovered.  [11 RT 3012-14, 3016; 19 RT 5758-59.]  The bullet

18  traveled slightly from the left to the right and in an upward direction as it passed through the

19  head.  [11 RT 3016-17.]  The medical examiner concluded that Cabrera died "rapidly," in a

20  matter of seconds to minutes.  [11 RT 3013.]  She confirmed that "[i]n all likelihood," he was

21  shot and then fell in the location where he had been standing.  [11 RT 3033.]  She also opined

22  that the wound was caused by a handgun, not a shotgun.  [11 RT 3039-40.]

23  **C. The Investigation**

24      Following the incident, officers located a shotgun on the northbound 405 freeway in the

25  area where officers had pursued Flores and his female companions.  [13 RT 3673-74.]  A

26  firearms expert recovered four 12-gauge shotgun shell casings and shotgun shell wadding

27  from the intersection of Los Angeles and Virginia where Misty Luna stopped her vehicle.  [10

28  RT 2780, 2783-84; 16 RT 4530-31; 18 RT 5402-10.]  The shotgun was capable of firing the

1  shells found at the intersection.  [18 RT 5413.]

2      Officers also recovered two revolvers from the doghouse in the Cabreras' backyard.  [13

3  RT 3705-09.]  One was stainless steel and contained six expended .38 cartridges, while the

4  other was blue steel and contained six unspent rounds.  [13 RT  3706.]

5      Damage to the side of the Cabrera home and to vehicles parked next door indicated

6  that shots had been fired from west to east and from east to west.  [18 RT 5403-04, 5414,

7  5417-21.]  Scott Wolf testified that in order for one of the weapons fired from the Cabrera

8  residence to hit David Cabrera across the street, the bullet would have had to "magically"

9  change direction.  [12 RT 3340-44.]

10      Criminalists conducted gunshot residue tests on Petitioner's car and received positive

11  results in the area of the front passenger seat, front passenger headliner, front passenger

12  door, and steering wheel.  However, it could not be determined how long the gunshot residue

13  had been in the car.  [15 RT 4207-08, 4212-13.]

14      After his arrest, Petitioner's girlfriend visited him in jail.  Jail staff surreptitiously recorded

15  a conversation in which Petitioner asked his girlfriend if she remembered "when [he] shot [his]

16  own car?"[4]  [1 CT 249.]  When she responded yes, Petitioner stated, "There's one of the same

17  bullets in that fuckin car."  [1 CT 249.]  He then gave her directions on how to recover the

18  bullet, explaining that the bullet was "from the same barrel."  [1 CT 249-50.]  He also instructed

19  her to get the car detailed "cause you never know."  [1 CT 251.]  Investigators located a hole in

20  the driver's seat of Petitioner's Intrepid but did not locate a bullet.  [20 RT 6120, 6326-27.]

21  **D. The Gang Experts**

22      The prosecution presented the testimony of two gang experts.  The first expert, Sheriff's

23  Deputy Daren Diviak, testified at some length.  Deputy Diviak indicated he was familiar with the

24  Dog Patch and East Side Paramount gangs and the territory they claimed.  [17 RT 4832, 4837,

25  4839-44.]  He identified Petitioner and Flores as members of the Dog Patch gang.  [17 RT

26  4849-51, 4858-67.]  He identified the victim, David Cabrera, as a member of the rival East Side

27  

28  [4]  A tape recording of the conversation was played for the jury and was admitted only as to
Petitioner.  [20 RT 6111-15.]

1    Paramount gang.  [17 RT 4867-68.]

2        Deputy Diviak explained that the primary activities of the Dog Patch gang included

3    assault, sale of controlled substances, murder, felony vandalism, grand theft, grand theft auto,

4    robbery, burglary, and witness intimidation.  [18 RT 5109-10.]  "Turf" was very important to

5    gangs in general, and to the Dog Patch gang in particular.  [17 RT 4846.]  He explained,

6    "That's the area they claim.  That's their neighborhood.  That's their stronghold, and they'll do

7    whatever's necessary to defend that area out of respect for their neighborhood and gang."  [17

8    RT 4846.]

9        Deputy Diviak also testified that whether it would be acceptable for an East Side

10   Paramount member to attend a relative's party in Dog Patch territory would depend on the

11   nature of the relationship between the rival and the family members.  [17 RT 4884.]  He

12   explained that it would be "very disrespectful" if the East Side Paramount member did not

13   leave Dog Patch territory immediately after the party.  [17 RT 4886.]

14       The prosecutor presented Deputy Diviak with a lengthy hypothetical scenario based on

15   the facts of the crime, including the fact that a Dog Patch member had seen a rival gang

16   member at a party, the Dog Patch member armed himself and drove in the direction of the

17   rival's house, the Dog Patch member directed a fellow gang member to follow him, the

18   vehicles drove slowly past the rival's house several times, and shots were fired after the rival

19   confronted the Dog Patch members at gunpoint.  [17 RT 4874-81.]  Deputy Diviak opined that

20   based on the facts provided, the charged offenses were committed for the benefit of the Dog

21   Patch street gang.  [17 RT 4881-82.]  He explained as follows.

22       "Given the hypothetical situation that going and – the description you gave me is

23       a classic drive-by shooting or attempted walk up shooting which is common with

24       gangs.  And given the information in the hypothetical that they drove there, two

25       vehicles, went by, waited for the person to come out and engage in gunfire with

26       that person, that would be very much so a drive-by shooting."

27   [17 RT 4882.]  Deputy Diviak testified that if a Dog Patch member killed a rival gang member,

28   his reputation would be enhanced among his fellow gang members and their rivals.  [17 RT

4882-84.]

Deputy Diviak was not cross-examined by either defense counsel.

The second gang expert testified that he was familiar with the Dog Patch gang and the territory it claimed, and identified Petitioner and Flores as members of the Dog Patch gang. [18 RT 5133-38.]

**E.  The Trial**

Petitioner and Damon Flores were tried jointly.  Misty Luna initially was charged with murder and conspiracy to commit murder.  The prosecution agreed to drop those charges and accepted her plea to being an accessory after the fact in exchange for her testimony against Petitioner and Flores.  [7 RT 1828; 8 RT 2129-31, 2141-45.]  Marisela Ballesteros and Andres Moreno testified at trial pursuant to a grant of immunity from prosecution.  [11 RT 3075; 12 RT 3469.]  For reasons that were not disclosed in the record, the prosecution elected not to call Sylvia Moran as a witness.  [9 RT 2408.]

Following the presentation of the prosecution's case, the defense moved for a judgment of acquittal.  [20 RT 6603-22.]  Without disclosing its reasoning, the trial court granted the motion as to the murder charge.  [20 RT 6622.]

Flores called a single defense witness, Gloria Ontiveros, who testified that she knew both Petitioner and Flores and that neither one of them attended the birthday party on the day of the shooting.  [20 RT 6626.]

Petitioner was convicted of conspiracy to commit murder and shooting at an inhabited dwelling.  Later, the appellate court reversed his conviction for shooting an inhabited dwelling, leaving Petitioner's conviction for conspiracy to commit murder as the sole basis for his incarceration.  [2 CT 408-11, 505; 20 RT 6622; 23 RT 7806-07; Lodged Doc. 8 at 11-12.]

## **Petitioner's Claims**

Petitioner asserts the following grounds for federal habeas corpus relief:

1.  The evidence is insufficient to support his conviction for conspiracy to commit murder.

2.  The prosecutor violated Petitioner's federal due process rights by engaging in

1   misconduct throughout the trial.

2       3.  The trial court violated Petitioner's Sixth Amendment right to confront witnesses

3   when it admitted the gunshot residue evidence.

4       4.  The trial court violated Petitioner's federal due process rights when it failed to instruct

5   the jury on the lesser included offense of conspiracy to commit assault with a firearm.

6                           **Standard of Review**

7       Review of the Petition is governed by the Antiterrorism and Effective Death Penalty Act

8   of 1996 ("AEDPA").  See Woodford v. Garceau, 538 U.S. 202, 207 (2003).  Under AEDPA, a

9   federal court may not grant a writ of habeas corpus on behalf of a person in state custody "with

10  respect to any claim that was adjudicated on the merits in state court proceedings unless the

11  adjudication of the claim (1) resulted in a decision that was contrary to, or involved an

12  unreasonable application of, clearly established federal law, as determined by the Supreme

13  Court of the United States; or (2) resulted in a decision that was based on an unreasonable

14  determination of the facts in light of the evidence presented in the state court proceeding."  28

15  U.S.C. § 2254(d).

16      "Clearly established federal law" within the meaning of 28 U.S.C. § 2254(d)(1), "refers to

17  the holdings, as opposed to the dicta," of the Supreme Court's decisions as of the time of the

18  relevant state court decision.  Williams v. Taylor, 529 U.S. 362, 412 (2000).  Under this clause,

19  "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to

20  that reached by [the Supreme Court] on a question of law or if the state court decides a case

21  differently than [the Supreme Court] has on a set of materially indistinguishable facts."  Id. at

22  412-13.  "Under the 'unreasonable application' clause, a federal habeas court may grant the

23  writ if the state court identifies the correct governing legal principle from [the Supreme Court's]

24  decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at

25  413.

26                              **Discussion**

27  **A.    Sufficiency of the Evidence**

28      In his first claim, Petitioner argues there was insufficient evidence to prove the charge of

1   conspiracy to commit murder.  Specifically, he contends the evidence did not support a finding
2   that he and Flores agreed to kill the victim, or that he specifically intended to kill the victim.
3   [First Am. Petition at 5A.]

4   **1.  Review of Petitioner's Claim Under AEDPA**

5   "[T]he Due Process Clause protects the accused against conviction except upon proof
6   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is
7   charged."  In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner is entitled to federal
8   habeas relief on a claim of insufficient evidence if the court determines that "'no rational trier of
9   fact could have found proof of guilt beyond a reasonable doubt.'"  McDaniel v. Brown, 130 S.
10  Ct. 665, 666 (2010) (per curiam) (quoting Jackson v. Virginia, 443 U.S. 307, 324 (1979)).  In
11  making this determination, the Court is not authorized "to ask itself whether *it* believes that the
12  evidence at the trial established guilt beyond a reasonable doubt."  Jackson, 443 U.S. at 318-
13  19 (emphasis in original).  Rather, the Court must view the evidence in the light most favorable
14  to the prosecution.  Id. at 319, 326.

15  "Expressed more fully, this means a reviewing court 'faced with a record of historical
16  facts that supports conflicting inferences must presume – even if it does not affirmatively
17  appear in the record – that the trier of fact resolved any such conflicts in favor of the
18  prosecution, and must defer to that resolution.'"  McDaniel, 130 S. Ct. at 673 (quoting Jackson,
19  443 U.S. at 326).  This approach preserves "'the factfinder's role as weigher of the evidence.'"
20  McDaniel, 130 S. Ct. at 674 (quoting Jackson, 433 U.S. at 319).

21  AEDPA requires a federal court to apply the Jackson standard with an additional layer
22  of deference.  Briceno v. Scribner, 555 F.3d 1069, 1078 (9th Cir. 2009); Juan H. v. Allen, 408
23  F.3d 1262, 1274 (9th Cir. 2005), cert. denied, 546 U.S. 1137 (2006).  The issue the Court must
24  address is "whether the decision of the California Court of Appeal reflected an 'unreasonable
25  application of' Jackson and Winship to the facts of this case."  Juan H., 408 F.3d at 1274-75;
26  Briceno, 555 F.3d at 1078.  To warrant federal habeas relief, the court of appeal's application
27  of Jackson must be "objectively unreasonable."  Juan H., 408 F.3d at 1275 n.13.

28  While a federal court on habeas corpus must remain "mindful of 'the deference owed to

1   the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency

2   review,'" this deference is "not without limit."  Juan H., 408 F.3d at 1275 (quoting Wright v.

3   West, 505 U.S. 277, 296-97 (1992) (plurality opinion)).  "Even in the context of federal habeas,

4   deference does not imply abandonment or abdication of judicial review."  Miller-El v. Cockrell,

5   537 U.S. 322, 340 (2003).

6   **2.  Elements of Conspiracy Under California Law**

7   In reviewing Petitioner's claim, the Court refers to the substantive elements of the

8   conspiracy charge as defined by state law.  Jackson, 443 U.S. at 324 n.16.  Furthermore, the

9   Court defers to the state courts' interpretation of state law.  See Wainwright v. Goode, 464

10  U.S. 78, 84 (1983); Missouri v. Hunter, 459 U.S. 359, 368 (1983).

11  Under California law, a conspiracy is "an agreement between two or more people to

12  commit a public offense."  People v. Herrera, 70 Cal. App. 4th 1456, 1464 (1999); see Cal.

13  Penal Code §§ 182, 184.  "A conviction for conspiracy requires proof of four elements: (1) an

14  agreement between two or more people, (2) who have the specific intent to agree or conspire

15  to commit an offense, (3) the specific intent to commit that offense, and (4) an overt act

16  committed by one or more of the parties to the agreement for the purpose of carrying out the

17  object of the conspiracy."  People v. Vu, 143 Cal. App. 4th 1009, 1024 (2006) (citing People v.

18  Morante, 20 Cal. 4th 403, 416 (1999)).

19  As noted by the California Court of Appeal in this case, "[c]onspiracy is a specific intent

20  crime.  The specific intent required divides logically into two elements: (a) the intent to agree,

21  or conspire, and (b) the intent to commit the offense which is the object of the conspiracy.  To

22  sustain a conviction for conspiracy to commit a particular offense, the prosecution must show

23  not only that the conspirators intended to agree *but also that they intended to commit the*

24  *elements of that offense*."  [Lodged Doc. 8 at 6-7 (emphasis in original) (quoting People v.

25  Swain, 12 Cal. 4th 593, 600 (1996).]

26  "[A]ll murder conspiracies are conspiracies to commit first degree murder."  People v.

27  Cortez, 18 Cal. 4th 1223, 1232 (1998).  To prove a conspiracy to commit murder, the

28  prosecution must show that each of the conspirators harbored the specific intent to kill, which

1   is the equivalent of express malice.  Id. at 1229; Swain, 12 Cal. 4th at 602.  Conspiracy to

2   commit murder "does not require, as a factual matter, a premeditated and deliberate intent to

3   kill unlawfully.  But an intent of such character is present in the context of a conspiracy,

4   practically by definition, because it does not arise of a sudden within a single person but is

5   necessarily formed and then shared by at least two persons.'"  Cortez, 18 Cal. 4th at 1232-33

6   (quoting Swain, 12 Cal. 4th at 613 (Mosk, J., concurring)).

7        In summary, to sustain a conviction against Petitioner for conspiracy to commit murder,

8   the prosecution was required to show:  (1) Petitioner and Flores entered into an agreement to

9   kill unlawfully a human being; (2) each of them specifically intended to enter into an agreement

10  to kill a human being; (3) each of them harbored a specific intent to kill; and (4) one or both of

11  them committed an overt act in furtherance of the agreement.  See CALJIC 8.69;[5] Cortez, 18

12  Cal. 4th at 1229; Swain, 12 Cal. 4th at 602.

13       **3. California Court of Appeal's Decision**

14       The California Court of Appeal focused on Petitioner's argument that the only proof of

15  an agreement to murder Cabrera came from the testimony of the gang expert.  [Lodged Doc. 8

16  at 6.]  The court of appeal concluded that in addition to the testimony by the gang expert, the

17  evidence of the conduct of Petitioner and Flores was sufficient to support the conspiracy

18  conviction, reasoning as follows.

19       "It is true that the trial court dismissed a charge alleging Cabrera's

20       murder....  Irrespective of whether it was shown beyond a reasonable doubt that

21       Chavarria fired the fatal bullet from his Intrepid, the evidence nevertheless

22       established that Flores armed himself with a shotgun immediately after leaving

23       the party, Flores told Chavarria to follow him because he knew where a rival

24

25   ───────────────

26   [5] At the time of Petitioner's trial in 2003, the California Judicial Council had not yet adopted the
     CALCRIM instructions.  See Cal. Ct. R. 2.1050.  In reviewing Petitioner's claim that the trial court
27   erred in instructing the jury on conspiracy, the California Court of Appeal noted that the trial court
     did not provide CALJIC 8.69.  Nonetheless, the court of appeal concluded that the elements of
28   conspiracy were adequately conveyed by the remainder of the instructions.  [Lodged Doc. 8 at 8-
     10.]

1   gang member lived, Flores and Chavarria made several passes by Cabrera's

2   residence in their respective vehicles, both buckshot and bullets hit the Cabrera

3   residence, and following his arrest Chavarria expressed concern about having

4   shot a bullet with the 'same barrel' as a bullet previously shot into the door of the

5   Intrepid.  Thus, in addition to expert evidence regarding the proclivities of rival

6   gang members, the record establishes that defendants took specific, calculated

7   steps to murder Cabrera, thereby providing substantial evidence to support the

8   convictions of conspiracy."

9   [Lodged Doc. 8 at 7.]

10      **4.  Analysis**

11      As explained above, the trial court did not disclose its reasoning for granting the

12  judgment of acquittal on the murder charges.  [20 RT 6622.]  Ordinarily, AEDPA requires that

13  "a determination of a factual issue made by a State court shall be presumed to be correct."  28

14  U.S.C. § 2254(e)(1).  The trial court's ruling in granting the judgment of acquittal does not

15  appear to amount to "a determination of a factual issue" as contemplated by AEDPA.  Because

16  it is not possible to discern the basis for the trial court's ruling, it is difficult to draw any

17  conclusions about the trial court's view of the evidence.  In fact, in his closing argument the

18  prosecutor specifically relied on the theory that Petitioner was the shooter in arguing the case

19  to the jury.  [21 RT 6968-75.]  The fact that the prosecutor was permitted to advance this

20  argument reinforces the difficulty in evaluating the basis for the trial court's ruling.

21  Furthermore, in his Objections, Respondent notes that "there is no prohibition against

22  considering all of the evidence in the record to determine the sufficiency of evidence on one

23  count merely because the jury did not reach a unanimous verdict on a count to which the

24  evidence may have related."  People v. Consuegra, 26 Cal. App. 4th 1726, 1734 n.6 (1994).

25  For all of these reasons, the Court is persuaded that it is appropriate to consider the evidence

26  surrounding the shooting, including the evidence indicating it was Petitioner who shot and

27  killed Cabrera, in evaluating Petitioner's sufficiency of the evidence claim.

28      Viewed in the light most favorable to the prosecution, the evidence supports the

1   following reasonable inferences.

2       David Cabrera, an East Side Paramount gang member, attended a party in Dog Patch

3   territory.  Two Dog Patch members, Damon Flores and Sylvia Moran, also attended the party.

4   Moran sought out Flores after leaving the party, and Flores joined Moran in Misty Luna's

5   Cadillac.  Flores exited the vehicle for five to ten minutes and returned with a rifle.  Flores

6   wanted to go to a rival's house and was upset because "that fool" had been driving around in

7   Dog Patch territory.  The gang expert indicated that a rival's presence in Dog Patch territory

8   would be an affront to the Dog Patch gang and it would do whatever was necessary to defend

9   its turf.  This evidence leads to the reasonable conclusion that Flores and Moran were upset

10  that Cabrera had attended the party and had been lingering in Dog Patch territory, and Flores

11  armed himself in order to carry out an act of retaliation.

12      Next, Petitioner, a Dog Patch member, drove up behind Luna's Cadillac and flashed his

13  headlights.  No evidence was introduced to explain why Petitioner appeared behind the vehicle

14  or how he knew that Flores was in the vehicle.  The reasonable inference is that by some form

15  of communication, Petitioner had been alerted to seek out Flores, and that he had reason to

16  know that Flores was in the Cadillac.  Immediately after flashing his lights, Petitioner pulled

17  abreast of the Cadillac to engage in conversation with Flores, further indicating their meeting

18  was planned.

19      Flores told Petitioner he knew where to locate "that cheese-sider," inferring that he was

20  identifying a specific individual and that Petitioner knew the identity of the person.  Flores then

21  directed Petitioner to follow him.  Additional conversation ensued between Petitioner and

22  Flores.  Based on Flores's act of arming himself in response to Cabrera's presence in Dog

23  Patch territory, his reference to "that cheese-sider," and their immediate journey to Cabrera's

24  home, it was reasonable to infer that Petitioner and Flores discussed Cabrera, formed a plan

25  of reprisal, and took immediate action to carry out their plan.  The evidence also supports the

26  reasonable inference that Petitioner and Flores had a shared motive for confronting Cabrera,

27  which is supportive of a conviction for conspiracy to commit murder.  See, e.g., People v.

28  Jurado, 38 Cal. 4th 72, 121 (2006), cert. denied, 549 U.S. 956 (2006) (finding the conspirators

1  had a motive to kill the victim to prevent her from revealing their plot to kill another person);

2  Vu,143 Cal. App. 4th at 1025 (finding the defendant and his co-conspirators had a common

3  motive to kill the victim as revenge for the prior killing of a fellow gang member); Herrera, 70

4  Cal. App. 4th at 1464 (same).

5       Both Petitioner and Flores were armed when they drove to the Cabrera home, indicating

6  they were prepared for a violent confrontation.

7       At Flores's direction, Luna drove past David Cabrera's residence three times, with

8  Petitioner following one car length behind.  The vehicles traveled slowly, at approximately five

9  miles per hour, and paused once in front of the Cabrera home, which Flores confirmed was the

10  home of their target.  This indicates that Petitioner and Flores were targeting Cabrera in a

11  coordinated fashion by working as a team to identify his residence.

12       Luna and Petitioner returned a fourth time, driving ten to fifteen miles an hour, with

13  Petitioner one car length behind.  The fact that they returned a fourth time indicates that they

14  were not driving by simply as a warning or to gather information about the surroundings.

15  Instead, the numerous passes indicated they were acting in concert with a more sinister

16  purpose.

17       As the two vehicles approached the Cabrera home, David Cabrera stepped forward

18  from the neighbor's yard across the street and confronted Flores at gunpoint.  The Cadillac

19  proceeded past Cabrera without incident and Cabrera turned his gun on Petitioner's vehicle.

20  Three shots were heard coming from the area where Cabrera stood near Petitioner's vehicle.

21  Cabrera died from a bullet that entered the front of his face and traveled up and to the right

22  across his skull before exiting the back of his head, which was consistent with being shot from

23  Petitioner's location as he passed Cabrera in his vehicle.  The gunshot residue located inside

24  Petitioner's car further supported this inference.

25       Andres Moreno and Scott Wolf did not see Cabrera after the initial shots were fired.

26  The medical testimony showed that Cabrera died within seconds to minutes and likely fell to

27  the ground when he was shot.  A blue steel revolver next to Cabrera's body contained six

28

1   unspent rounds.[6]  No additional rounds were fired from the location where Cabrera had been
2   standing.  This evidence indicates that Petitioner was ready to engage in an armed
3   confrontation.  By reacting immediately to shoot Cabrera in the face before Cabrera fired a
4   single round, the evidence showed that Petitioner's intention was to shoot to kill.

5           The gun battle that followed the shooting of David Cabrera provides further evidence of
6   Petitioner and Flores's intent to kill.  Rather than simply leaving the area after the initial shots
7   were fired by Petitioner, Flores directed Luna to stop her car so that he could get out.
8   Petitioner and Flores then engaged in a gun battle with Ricardo Cabrera and a second man.
9   These actions support the reasonable inference that the shooting of David Cabrera was not
10  accidental, but rather that Petitioner and Flores intended to engage the rival gang members in
11  a deadly gun battle with the intent to kill one or more rivals.

12          By acting in tandem in a coordinated fashion to attack rival gang members with deadly
13  force, the facts support the reasonable inference that Petitioner and Flores entered into an
14  agreement to kill an Eastside Paramount gang member, and acted with the specific intent to
15  kill.  See, e.g., Vu,143 Cal. App. 4th at 1026-28 (acts by conspirators in converging on café
16  where rival gang members had been spotted, and communicating by cell phone immediately
17  prior to and during the crime, indicated a preplanned agreement to murder); Herrera, 70 Cal.
18  App. 4th at 1464 (conspirators drove past rival gang members twice and fired a dozen rounds);
19  People v. Tran, 47 Cal. App. 4th 759, 772-73 (1996) (conspirators traveled to a restaurant
20  together and one entered and shot the victim immediately after arriving, while the other waited
21  outside as a look out).

22          Although there was no evidence that either Petitioner or Flores knew the other was
23  armed or regularly carried a gun, this was not critical, in view of the remaining evidence that
24  the two intended to kill and conspired with the same intent.  Cf. Vu, 143 Cal. App. 4th at 1027
25  (in the defendant's presence, fellow gang members advised a third gang member of the

26
27          [6] The second stainless steel revolver found near the victim's body was consistent with the gun
28  Andres Moreno saw Ricardo Cabrera shooting and most likely was left next to the body when
    Ricardo approached the victim after the shooting.

1   location of a gun); <u>Herrera</u>, 70 Cal. App. 4th at 1464 (the defendant armed himself in the

2   presence of a fellow gang member); <u>Tran</u>, 47 Cal. App. 4th at 772 (both conspirators were

3   armed as they drove to the site of the shooting together).

4         Because the evidence as a whole indicated Petitioner and Flores acted in a coordinated

5   fashion with a common purpose to commit murder, Petitioner's conviction is distinguishable

6   from other gang related convictions that relied solely on gang membership to prove intent.  For

7   example, in <u>Juan H. v. Allen</u>, the Ninth Circuit reversed the conviction of a gang member for

8   murder under an aiding and abetting theory because there was no evidence the petitioner

9   knew the perpetrator planned to commit the crime of first degree murder, or that the petitioner

10  specifically intended to encourage or facilitate the killings.  <u>Juan H.</u>, 408 F.3d at 1277-78.  In

11  <u>United States v. Garcia</u>, the court considered a conviction for conspiracy to commit assault

12  arising out of a shooting between rival gangs.  The court found that because the circumstances

13  of the shooting were chaotic and did not indicate advance coordination and planning, the facts

14  did not support an inference of a prior agreement to commit assault.  <u>United States v. Garcia</u>,

15  151 F.3d at 1245; <u>see also</u> <u>Mitchell v. Prunty</u>, 107 F.3d 1337, 1341-42 (9th Cir.), <u>cert. denied</u>,

16  522 U.S. 913 (1997) (holding the evidence was insufficient to support the conviction of a gang

17  member for murder under an aiding and abetting theory where he did not know his fellow gang

18  members intended to shoot the victim from the landing of his apartment), <u>overruled in part on</u>

19  <u>other grounds</u>, <u>Santamaria v. Horsley</u>, 133 F.3d 1242 (9th Cir. 1998) (en banc).

20        In evaluating the sufficiency of the evidence, it is crucial to recall that "[i]t is not enough

21  that we might have reached a different result ourselves or that, as judges, we may have

22  reasonable doubt."  <u>Jones v. Wood</u>, 207 F.3d 557, 563 (9th Cir. 2000).  If the trier of fact could

23  have drawn conflicting inferences from the evidence, this Court must accept the inference that

24  supports the conviction.  <u>Wright</u>, 505 U.S. at 296-97; <u>Jackson</u>, at 326.  Because a rational trier

25  of fact could have found proof beyond a reasonable doubt of every element of the crime of

26  conspiracy to commit murder, the California Court of Appeal's denial of Petitioner's claim was

27  not an objectively unreasonable application of the <u>Jackson</u> standard.

28

**B. Prosecutorial Misconduct**

In his second ground for federal habeas relief, Petitioner argues the prosecutor engaged in misconduct by repeatedly asking leading questions and by failing to disclose material evidence as required by <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  [First Am. Petition at 5A; Lodged Doc. 11 at 13-16.][7]

The California Court of Appeal rejected Petitioner's claim as follows:

"The record reflects that the prosecutor was late in producing certain information regarding Misty Luna's immunity agreement, police sketches of firearm damage, field identification cards, and impeachment information relevant to an investigating officer.  The record further reflects that the prosecutor made frequent use of improper leading questions.  But defendant cannot point to any specific prejudice he suffered as a result of these prosecutorial transgressions.  This is especially true because the trial court instructed the jury that 'the People's concealment or failure to timely disclose was without lawful justification,' and during the course of trial the trial court frequently admonished the prosecutor, in the presence of the jury, about the impropriety of his leading questions."

[Lodged Doc. 8 at 14-15.]

**1. Prosecutor's Use of Leading Questions**

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982).  Thus, prosecutorial misconduct rises to the level of a constitutional violation only

---

[7]  The First Amended Petition asserts that "[t]he prosecutor repeatedly disregarded the court's evidentiary rulings, repeatedly elicited and made reference to he[a]rsay previously ruled inadmissible and outside the factual record, and evidenced a blatant ignorance of how to conduct a fair trial."  [First Am. Petition at 5A.]  Petitioner then directs the Court's attention to his argument in his petition for review filed in the California Supreme Court.  [First Am. Petition at 5A.]  The petition for review addresses only the prosecutor's leading questions and failure to disclose <u>Brady</u> material.  To the extent Petitioner seeks to raise other issues in his First Amended Petition, he fails to state a claim with sufficient particularity to allow review by this Court.  <u>See</u> <u>Jones v. Gomez</u>, 66 F.3d 199, 204-05 (9th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1143 (1996) (conclusory allegations unsupported by a statement of specific facts do not warrant federal habeas relief).

1  where it "so infected the trial with unfairness as to make the resulting conviction a denial of due

2  process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo,

3  416 U.S. 637, 643 (1974)).

4      With respect to leading questions, "[i]n the discretion of the judge, some leading

5  questions can be proper and would only justify reversal if their use amounted to a denial of a

6  fair trial." Turner v. Marshall, 63 F.3d 807, 818 (9th Cir. 1995), overruled on other grounds by

7  Tolbert v. Page, 182 F.3d 677, 685 (9th Cir. 1999).  No prejudice occurs when the trial judge

8  sustains objections to the leading questions.  Turner, 63 F.3d at 818.

9      As to the first round of leading questions challenged by Petitioner, after defense counsel

10  asserted numerous objections, the trial court explained that "we've had a long break, four

11  days" and the court would "allow [the questioning] to make sure that the court and the jury

12  recalls that part of her testimony." [8 RT 2125-26.]  In almost every other instance challenged

13  by Petitioner, the trial court sustained defense objections to the leading questions, the trial

14  court admonished the prosecutor not to lead the witness, or the question was withdrawn or not

15  answered for other reasons.  [8 RT 2146; 9 RT 2444, 2445, 2478-79; 10 RT 2769, 2869; 11

16  RT 3049; 12 RT 3342, 3345, 3346, 3466, 3469; 14 RT 3932, 3985; 15 RT 4330; 17 RT 4842,

17  4887; 18 RT 5450, 5451.]  On three of the occasions challenged by Petitioner, the trial court

18  allowed the witness to answer a leading question.  [11 RT 3048, 3049; 15 RT 4329.]

19      To the extent the prosecutor engaged in improper questioning, the trial court neutralized

20  the potential prejudice by repeatedly sustaining defense objections and admonishing the

21  prosecutor in front of the jury.  See Turner, 63 F.3d at 818.  The few instances cited by

22  Petitioner in which a witness was allowed to answer a leading question did not result in such

23  "unfairness as to make the resulting conviction a denial of due process."  Darden, 477 U.S. at

24  181.  Accordingly, the state court's denial of this claim was not contrary to, or an unreasonable

25  application of, clearly established federal law.

26      **2. Failure to Disclose Brady Material**

27      Petitioner contends the prosecutor violated Brady v. Maryland by withholding rap sheets

28  of prosecution witnesses and documents related to immunity agreements with prosecution

1 witnesses.

2      Under <u>Brady</u>, the prosecution is required to disclose to the defense any evidence that is

3 material either to guilt or to punishment. <u>Strickler v. Greene</u>, 527 U.S. 263, 280 (1999).

4 Evidence is material if "'there is a reasonable probability that, had the evidence been disclosed

5 to the defense, the result of the proceeding would have been different.'" <u>Id.</u> (quoting <u>United</u>

6 <u>States v. Bagley</u>, 473 U.S. 667, 682 (1985)).  "No [<u>Brady</u>] violation occurs if the evidence is

7 disclosed to the defendant at a time when the disclosure remains of value." <u>United States v.</u>

8 <u>Juvenile Male</u>, 864 F.2d 641, 647 (9th Cir. 1988); <u>United States v. Vgeri</u>, 51 F.3d 876, 880 (9th

9 Cir. 1995).

10      The records shows that on numerous occasions during trial, defense counsel

11 complained that they had not received discovery material relevant to prosecution witnesses.

12 At various times, the trial court determined the prosecutor failed to timely disclose certain

13 information.  However, the defense received documentation regarding the immunity

14 agreements between the prosecutor and his witnesses in time to use such information during

15 cross-examination.  [11 RT 3075-76; 12 RT 3470-72.][8]

16      Petitioner claims he never received the rap sheets of unidentified prosecution

17 witnesses.  Under California law, the prosecution is not required to disclose rap sheets, as long

18 as it discloses other evidence of a witness's prior convictions. <u>People v. Roberts</u>, 2 Cal. 4th

19 271, 308 (1992), <u>cert. denied</u>, 506 U.S. 964 (1992).  Petitioner does not contend the

20 prosecutor failed to disclose all evidence concerning prior convictions.  In fact, the defense

21 cross-examined Misty Luna concerning her criminal history.  [8 RT 2153, 2154.]  Because

22 Petitioner does not show the prosecutor failed to disclose material evidence, the state court's

23 denial of this claim was not contrary to, or an unreasonable application of, clearly established

24 federal law.

25 ///

26

27      [8] The Court notes that Misty Luna was not offered immunity in exchange for her testimony, but
28 rather testified pursuant to a plea agreement.  The defense had knowledge of the agreement and
cross-examined Luna regarding its existence.  [8 RT 2150, 2161-63.]

1   **C.  Confrontation Clause**

2        In his third claim, Petitioner contends the trial court violated his right to confrontation

3   under Crawford v. Washington, 541 U.S. 36 (2004), by admitting gunshot residue evidence

4   even though the criminalist who collected the samples was not available to testify.

5        Criminalist Tim Golt collected gunshot residue samples from Petitioner's Intrepid and

6   submitted them for testing.  At the time of Petitioner's trial, Golt was recovering from major

7   surgery and was unavailable to testify.  [14 RT 3959-61.]  Over Petitioner's objection, the trial

8   court admitted into evidence the samples collected by Golt and a form authored by him while

9   collecting the samples.  The jury then heard testimony by criminalist Robert Keil, who analyzed

10  the samples and concluded that they tested positive for gunshot residue.  [14 RT 3971, 3979-

11  82; 15 RT 4212-13.]

12       The California Court of Appeal rejected Petitioner's claim, finding that the evidence

13  attributable to Golt was not testimonial and thus its admission did not run afoul of Crawford.

14  [Lodged Doc. 8 at 14.]

15       In Crawford v. Washington, the Supreme Court noted a difference between testimonial

16  and nontestimonial out-of-court statements and clarified that testimonial statements are the

17  primary object of the Confrontation Clause.  Crawford, 541 U.S. at 51-53.  "Testimonial

18  statements" include prior testimony at a preliminary hearing, before a grand jury, or at a former

19  trial, and police interrogations.  Id. at 68.

20       In Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527 (2009), the Court applied Crawford

21  and held that the admission of a certificate of analysis of drug evidence in lieu of in-court

22  testimony from the analyst who performed the analysis violated the defendant's Sixth

23  Amendment right to confrontation.  Id. at 2532.  The Court concluded that such evidence was

24  testimonial in nature, id. at 2532, and adverse to the defendant.  Id. at 2533-34.  The Court

25  noted, however, that "it is not the case that anyone whose testimony may be relevant in

26  establishing the chain of custody, authenticity of the sample, or accuracy of the testing device,

27  must appear in person as part of the prosecution's case."  Id. at 2532 n.1.

28       In Petitioner's trial, the form created by the criminalist who gathered the gunshot residue

1    samples and the samples themselves did not "bear testimony" against Petitioner.  See

2    Melendez-Diaz, 129 S. Ct. at 2531.  Rather, it was the criminalist who analyzed the gunshot

3    residue samples, Robert Keil, who provided testimony against Petitioner in the form of his

4    opinion that the samples tested positive for gunshot residue.  Petitioner had the opportunity to

5    confront Keil on cross-examination.  Thus, in contrast to the defendant in Melendez-Diaz,

6    Petitioner was afforded his Sixth Amendment right to confront the witness against him.

7    Accordingly, the state court's denial of this claim was not contrary to, or an unreasonable

8    application of, clearly established federal law.

9    **D.   Instructional Error**

10         In his final claim, Petitioner argues the trial court erred by failing to instruct the jury

11   regarding the lesser included offense of conspiracy to commit assault with a firearm.  [First

12   Am. Petition at 6A.]

13         In capital cases, the Supreme Court has held that the jury must be presented with

14   instructions on lesser included offenses when there is evidence the defendant may have

15   committed a lesser crime.  Beck v. Alabama, 447 U.S. 625, 638 (1980).  The Supreme Court

16   has reserved judgment on whether such a rule should be applied to non-capital cases.  Id. at

17   632 n.8; see Howell v. Mississippi, 543 U.S. 440, 445 (2005) (suggesting Beck might not apply

18   in non-capital cases).  The Ninth Circuit has held that "[u]nder the law of this circuit, the failure

19   of a state trial court to instruct on lesser included offenses in a non-capital case does not

20   present a federal constitutional question."  Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir.

21   1998); Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000), cert. denied, 534 U.S. 839 (2001).

22   Accordingly, Petitioner's claim is not cognizable on federal habeas corpus review.  See 28

23   U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("In conducting habeas

24   review, a federal court is limited to deciding whether a conviction violated the Constitution,

25   laws, or treaties of the United States.").

26   ///

27   ///

28   ///

### Recommendation

For the reasons discussed above, IT IS RECOMMENDED that the Court issue an Order:  (1) approving and adopting this Amended Report and Recommendation; and (2) directing that judgment be entered denying the First Amended Petition with prejudice.

DATED:  October 15, 2010

_____
RITA COYNE FEDERMAN
UNITED STATES MAGISTRATE JUDGE